**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**


| | |
|---|---|
| **MJK PARTNERS, LLC, F. PAUL OHADI,** ) | |
| **F. PAUL OHADI, as Trustee of the F. Paul** ) | |
| **Ohadi Family Trust, and JAMES MANN,** ) | |
| **as Trustee of the Mann 1994 Family Trust,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 10 C 87** |
| ) | |
| **DAVID HUSMAN,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs MJK Partners, LLC, F. Paul Ohadi, individually and as trustee of the F.

Paul Ohadi Family Trust (Ohadi Trust), and James Mann, as trustee of the Mann 1994

Family Trust (Mann Trust), have sued David Husman. Plaintiffs assert a claim for

violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), as well as

state law claims for breach of fiduciary duty, breach of contract, and unjust enrichment.

Husman has moved for summary judgment on all claims. For the reasons stated below,

the Court grants defendant's motion in part and denies it in part.

## Background

Plaintiffs invested money in various projects through Husman, the founder of

Equibase Capital Corporation. They claim that Husman misappropriated from each of

the investments funds that should have gone to them.

## A.    Shaw Investments

In 1995, Dan K. Shaw obtained various oil and gas leases in the Flat Rock Field in Utah, which he operated through a company called Shaw Resources Limited LLC, d/b/a Orion (Orion).  Shaw sought the help of Husman to raise money to exploit the oil field.

As vehicles for investment, Shaw and Husman created Pegasus Resources, LLC; Scorpio Energy Resources, LLC; Aquarius Energy Resources, LLC; and Sagittarius Energy Resources, LLC.  Plaintiffs invested in these companies.  Ohadi, the Ohadi Trust, MJK, and Mann Investment Partners, LP (whose assets were later distributed in part to the Mann Trust) all purchased membership interests in at least one of Scorpio, Aquarius, or Sagittarius in 1999 or 2001.  Plaintiffs' investment in Pegasus operated differently.  A number of investors, including the Ohadi Trust and non-plaintiff Clarence Mann, contributed a total of $5 million to Husman to be loaned to Shaw.  Shaw pledged a number of his assets as collateral for the loan.  The loan was later turned into equity as membership interests in Pegasus.  Shaw was the manager of all of these entities, in addition to Orion.

To develop the oil fields, a pipeline was needed to transport natural gas away from the fields.  Comet Resources LLC, an entity controlled by Shaw, built the pipeline.  Husman loaned Shaw more than $5 million to build the pipeline and eventually received equity in Comet for the loan.  The parties dispute the origins of the money loaned to Shaw.  In the promissory note Shaw gave Husman in return for the loan, Husman is described as an "agent," but the note does not say for whom Husman was an agent.  Pl. Ex. 8 at 4298.  Plaintiffs claim that the money came in part from them, while Husman

2

claimed in his deposition that all of the money came from his personal bank account. Pl. Ex. 1 at 212–13.

In addition to the six oil and gas entities, Shaw also ran a Nevada casino through a company called VSS Enterprises, LLC. It is undisputed that Husman loaned Shaw personally at least $1.75 million for his casino, and Shaw stated in his deposition that Husman provided between $10 and $13 million. Pl. Ex. 4 at 70. Shaw claimed that Husman's money indirectly funded VSS, although Husman did not directly invest in VSS because he did not want to be subject to the disclosure requirements imposed on casinos in Nevada. *Id.* at 70–72. In return for his loans, Shaw paid Husman a twelve percent return. *Id.* at 73. Husman did not want to take an equity stake in VSS, so Shaw instead provided him additional equity in the oil and gas business in exchange for the casino loans. *Id.* at 72–73.

In 2003, Shaw's casino business was failing. Plaintiffs claim that, in particular, Shaw was having trouble paying the twelve percent return Husman's loans required. Shaw began to take money out of the oil businesses to support VSS. VSS filed for bankruptcy in June 2003. In July, Husman forced Shaw to resign as manager of the oil businesses and appointed Emergency Management Services (EMS), of which Husman was president, as manager of the oil businesses. After Husman removed Shaw from management, Shaw reached an agreement with EMS, which was acting as a collections agent for the six oil and gas entities. Shaw agreed that his liability to the companies was $22 million, subject to later adjustment, and he agreed to pledge much of his property as security for the debt to the companies. Pl. Ex. 3 at 2366; Pl. Ex. 27 at 29704–05. Among other property, Shaw pledged his equity interests in several of the

3

oil and gas entities, some of the assets he had previously pledged as collateral for the Pegasus loan, and a promissory note made by VSS to Shaw for more than twenty-two million. *Id.* at 29770. One asset that Shaw did not turn over to the oil and gas entities was his thirty percent interest in Comet, which he instead assigned directly to Husman.

In September 2003, Husman sent a letter to Ohadi and MJK, whose managing member was Mann. The letter discussed Sagittarius, in which the Ohadi Trust and MJK were members. Husman stated that Shaw was no longer manager of any of the oil and gas entities because he had been using company funds personally and had commingled assets from Sagittarius with assets of the other entities. The letter informed Sagittarius members that EMS had retained outside counsel and forensic accountants to investigate the companies and pursue any funds that had been diverted outside the oil and gas entities. The letter did not mention Shaw's casino business directly or that Husman had contributed funds to it and was a major creditor of Shaw.

In 2004, Husman sent a memorandum, through EMS, to all of the investors in the oil and gas entities except Comet, proposing to combine the five other oil and gas entities. Under Husman's plan, all investors would give their ownership interests in the oil and gas entities to Chicago Energy Associates, LLC (CEA) and would receive in return proportionate membership interests in CEA. Subsequently, the oil and gas entities would transfer all of their assets to CEA, and EMS would contribute any assets it had recovered while acting as a collection agent for the oil and gas entities. Husman stated that the restructuring was necessary to eliminate operating inefficiencies and risks associated with running so many separate entities. The memorandum mentioned that Comet had constructed a pipeline used by the other oil and gas entities, but it

4

described Comet only as "a Nevada limited liability company which[ ] is owned by certain Members [of the oil and gas entities]." Def. Ex. 12-A at 29109.

The five oil and gas entities became part of CEA, and the plaintiffs became members of it. Comet remained a separate company. Subsequently, CEA and Comet negotiated a deal in which Comet, represented by Husman, agreed to carry CEA gas in its pipeline in exchange for a fee. Comet's assets were sold in 2008 for $35 million. None of the proceeds of that sale went to plaintiffs or other investors in CEA.

In addition to taking Comet's assets, plaintiffs also contend that Husman kept property of Shaw's that should have gone to CEA. One of the assets Shaw transferred to EMS in 2003, as collection agent for the oil and gas entities, was his interest in a real estate development called Grand Plaza Apartments. Pl. Ex. 27 at 29770. Husman signed the agreement transferring Grand Plaza as president of EMS. Husman now claims, however, that Shaw's interest in Grand Plaza had in fact been transferred to him personally two years earlier, as consideration for his assumption of a loan that Shaw had obtained from MB Financial Bank. Pl. Ex. 28 at 4037–39. Plaintiffs claim that Husman received a distribution of more than $10 million in 2004, when Grand Plaza was sold. Pl. Ex. 36. Plaintiffs also contend that Husman personally received $1.8 million after the sale of Red Bluffs Office Park in 2007, another property that Shaw transferred to EMS. Pl. Ex. 37 at 2938; Pl. Ex. 38 at 81–85.

**B.    Plaza Square investment**

Plaza Square Apartments was a large housing development in St. Louis owned and operated by Plaza Square Partners, LLC. Husman, through Equibase, organized a group of investors who purchased fifty percent of Plaza Square for $4 million in

February 1999.  In return, they received a guarantee of their investment from Ed Carlson, the manager of Plaza Square.  Carlson also pledged his personal property as collateral for the guarantee.

The original investors that Husman recruited had the right to request that Husman buy them out, and they did so later in 1999.  To obtain funds to pay back the original investors, Husman sought funds from Ohadi.  In August 1999, Ohadi provided Husman with $3 million.  Ohadi wrote two checks:  a $1 million check from himself and a $2 million check from his company, Paul D. Metals Products, Inc.  The parties agree, for the purposes of resolving this summary judgment motion only, that Husman and Ohadi orally agreed that Ohadi's money was a three-year loan to Husman personally.  Husman then used Ohadi's $3 million, along with $1 million of his own money, to replace the initial investors in Plaza Square.  Pl. Ex. 1 at 308–10.  Despite the fact that Ohadi was loaning money to Husman, Husman acted as Ohadi's lawyer on the transaction.

Although Husman concedes for the purposes of this motion that the money he received was a loan from Ohadi, at times in the past, including at his deposition, Husman has claimed that the money was not a loan but an equity investment that he and Ohadi made with Carlson.  *Id.* at 304–06.  Carlson himself testified that Plaza Square was structured as an investment by which Husman and his investors were guaranteed a twelve percent return and also a share of the project's equity.  Pl. Ex. 16 at 39–40.

The parties agree for the purposes of this motion that soon after receiving the loan, Husman promised to get Ohadi twenty-five percent of the equity in Plaza Square,

as a bonus for providing the loan.  Husman, however, wrote a letter on September 1, 1999, stating that he had paid $1 million and Ohadi had paid $3 million and that in return each would receive a twenty-five percent interest in Plaza Square, without mentioning any loan or calling Ohadi's equity a bonus.  Pl. Ex. 17.  Either way, Ohadi never received any equity.  Plaza Square had received funding from the Department of Housing and Urban Development (HUD), and HUD regulations included prerequisites that had to be met before any interest in Plaza Square could be transferred.  These requirements were never met and thus there could be no valid transfer of interest to Ohadi.

In December 1999, Ohadi asked to divide his personal interest in Plaza Square. He asked to assign one-third of his interest to "Paul Ohadi, Trustee, under the F. Paul Ohadi Trust Dated December 15, 1999" and to keep the remaining two-thirds under the name "Paul Ohadi, Trustee," stating that the two-thirds was unrelated to the Ohadi December 15 trust.  Def. Ex. 26.  Further, in 2001, Husman wrote a letter stating that the $2 million he received from Paul D. Metals was owed seventy-five percent to Ohadi's December 15, 1999 trust and twenty-five percent to "Paul Ohadi, Trustee."  Def. Ex. 4-C.

Ohadi received interest payments on his loan or investment for several years but did not get his money back when the loan came due in August 2002.  After that, Ohadi received intermittent payments of interest.  He testified at his deposition that Husman encouraged him to not demand the return of his principal because he was receiving a twelve percent return.  Pl. Ex. 18 at 320.  Ohadi received a payment on his loan as late as June 6, 2005, and in a letter accompanying that payment Husman told Ohadi that

7

Carlson would pay all interest due by August 1. Pl. Ex. 55.

Even before writing that letter, however, Husman was seizing property from Carlson and using it to pay unrelated debts. Husman took Carlson's interest in a property called the Grand Apartments in September 2003. In 2005, the Grand Apartments were sold, and Carlson received $2.05 million for his interest in them. At Husman's direction, Carlson paid $172,000 to Husman and Ohadi to pay some of the interest on the Plaza Square loan. Pl. Ex. 41. More than $1.5 million was used to pay off loans to Carlson from the Husman Foundation, and $342,000 was applied to a loan from a group referred to as "the Husman children." *Id.* Husman also took Carlson's interest in an apartment development called Prospect Heights, which was one of the developments specifically pledged by Carlson to the original Plaza Square investors to guarantee their investment. Pl. Ex. 16 at 84; Pl. Ex. 42; Def. Ex. 21 at 6629. Despite these seizures, in 2007 Husman wrote to Ohadi that Carlson's personal guarantee of the Plaza Square loans had no value and told Ohadi that another lawyer who informed him that the Plaza Square investors were being defrauded did not have the facts. Pl. Ex. 54.

Ohadi's $3 million has never been repaid, and he is still owed the majority of the interest due under the terms of the loan.

## C. Treasures Investment

In 1999, Husman asked Ohadi to invest in a limited partnership called Treasures Holdco, LP. Treasures owned part of a Florida real estate development. Ohadi and Husman agreed to invest $3 million, with Ohadi providing $2.25 million and Husman $750,000. They agreed that the interest they received would be split, with seventy-five

8

percent going to Ohadi and twenty-five percent to Husman. Any profits from the investment would be split, 56.25% to Ohadi and 43.75% to Husman. In December 1999, Ohadi asked Husman to transfer his interest in Treasures to his December 1999 trust.

Initially, Carlson had an option to purchase ten percent of Ohadi and Husman's investment. To do so, he had to pay $25,000 before September 12, 2001. Pl. Ex. 46. Carlson testified in his deposition that he did not do so, but he also stated that he and Husman might have had an agreement where Husman covered the $25,000 payment for him. Pl. Ex. 16 at 127–28; Def. Reply, Ex. E at 278–81.

Treasures sold its property in 2004 for almost $50 million. In December 2007, Ohadi and Husman had already received $13 million for their investment, and $1.47 million remained to be distributed between the two. Ohadi and Husman's accountant initially calculated that Husman was entitled to $287,000 and Ohadi was entitled to $1.184 million. At Husman's direction, the accountant prepared a new schedule showing that Husman was entitled to $1.98 million and that Ohadi was not entitled to any additional payments and actually owed Husman $510,000. Although the new schedule contained several changes, one major change made at Husman's request was to assign him an additional fifteen percent of the profits from the Treasures investment, amounting to more than $1.7 million.

Husman justified assigning an additional share of the profits to himself by stating that Carlson had owned fifteen percent of Husman and Ohadi's Treasures investment and had assigned that fifteen percent to Husman. There is a document signed by Carlson purporting to assign his fifteen percent interest in Treasures to Husman in

October 2004.  Def. Reply, Ex. H.  In 2008, however, Carlson signed an affidavit indicating that he could find no records showing that his potential interest in Treasures had ever changed from ten percent to fifteen percent.  Pl. Ex. 47.  He testified that he would have remembered being given such a significant extra interest in Treasures.  Pl. Ex. 16 at 132.  According to Carlson, Husman requested that he sign an affidavit stating that he had a fifteen percent interest, but he refused.  *Id.* at 132–33.  After Carlson refused, Husman became upset and threatened him, saying that "it was a big mistake and that [Carlson] would pay for it."  *Id.* at 133.

## Discussion

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, a court may grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The plaintiffs assert a RICO claim based on Husman's actions in connection with of the investments discussed above and a breach of fiduciary duty claim concerning his actions related to the Shaw investments.  In addition, Ohadi asserts claims for breach of fiduciary duty, breach of contract, and unjust enrichment related to the Plaza Square investment and breach of contract related to the Treasures investment.  Husman

contends that he is entitled to summary judgment on all of these claims for a variety of reasons.

## A.    RICO claim

Plaintiffs contend that Husman operated Equibase through a pattern of racketeering activity, intending to defraud investors and enrich himself at their expense. 18 U.S.C. § 1962(c).

Husman contends, among other arguments, that plaintiffs' RICO claim is barred by a provision of the RICO statute stating that

> [a]ny person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.* The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud.

18 U.S.C. § 1964(c) (emphasis added).  The "except that" clause in section 1964(c) was added by the Private Securities Litigation Reform Act (PSLRA) to bar RICO claims based on securities fraud.  "The legislative history of subsection (c) reveals that Congress intended not only to eliminate securities fraud as a predicate offense in a civil RICO action, but also to prevent plaintiffs from attempting to plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."  *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 698, 2004 WL 2278545, at *5 (N.D. Ill. Oct. 8, 2004) (citing H.R. Conf. Rep. No. 104-369, at 47 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 746).  Congress reasoned securities laws generally provide an adequate remedy for

11

securities fraud and that imposition of the treble damages provided by RICO was unfair in those cases. *Id.*

"[C]ourts broadly construe section 1964(c) to preclude wire and mail fraud from forming predicate acts under RICO if such conduct would also be actionable as securities fraud" and do not allow plaintiffs to characterize claims narrowly to avoid the PSLRA bar. *Id.*; *see Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 329–30 (3d Cir. 1999) (acts taken to hide Ponzi scheme were intended to induce new investment and thus constituted securities fraud); *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 282 (S.D.N.Y. 2009). "The proper test is whether the conduct pled as predicate offenses is actionable as securities fraud." *Hollinger*, 2004 WL 2278545, at *6; *accord Payton v. Flynn*, No. 06 C 465, 2006 WL 3087075, at *6 (N.D. Ill. Oct. 26, 2006).

Husman argues that the conduct alleged by the plaintiffs violates section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), which bans the use of manipulative or deceptive devices or contrivances in connection with the purchase or sale of securities. "The elements of a section 10(b) Securities Exchange Act claim are: (1) a material misrepresentation or omission by the defendant in connection with the purchase or sale of securities; (2) scienter; (3) reliance; (4) economic loss; and (5) loss causation." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 617 (7th Cir. 2011). Plaintiffs contend that the frauds and misrepresentations they allege were not made in connection with the purchase or sale of securities.

To satisfy the "in connection with" requirement, "[i]t is enough that the scheme to defraud and the sale of securities coincide." *SEC v. Zandford*, 535 U.S. 813, 822

(2002) (theft of money from client's mutual fund account was securities fraud because it required broker to make otherwise legitimate sales of securities in the account); *Moorehead v. Deutsche Bank AG*, No. 11 C 106, 2011 WL 4496221, at *11–12 (N.D. Ill. Sept. 26, 2011) (securities were purchased as part of tax fraud, but claims were also securities fraud claims because plaintiffs hoped to profit from securities beyond the potential tax consequences).

In their complaint, plaintiffs alleged that Husman had used Equibase as part of an at least fourteen-year-long scheme to defraud investors like them. Compl. ¶¶ 2, 177. Faced with Husman's PSLRA bar argument, plaintiffs now argue that their purchases of securities in this case had all occurred by 2001, when they purchased membership interests in the oil and gas entities. They contend that Husman's fraud did not coincide with the securities purchases, because the fraud occurred later, in 2003 and 2004, when Husman took property from Shaw, including his interests in Comet, Grand Plaza, and Red Bluffs, and did not turn over the proceeds from those interests to the oil and gas investors. Plaintiffs argue that there is no evidence that Husman intended to defraud them at the time they purchased membership interests in the oil and gas entities.

On a motion for summary judgment, however, plaintiffs are bound by their complaint's allegation of a single fourteen-year scheme. *Soo Line R.R. v. St. Louis S.W. Ry.*, 125 F.3d 481, 483 (7th Cir. 1997); *see Gilmore v. Gilmore*, No. 09 Civ. 6230(WHP), 2011 WL 3874880 at *6 (S.D.N.Y. Sept. 1, 2011) (granting summary judgment on RICO claim because plaintiffs had alleged a single scheme that was barred by PSLRA; they could not later assert only those of the RICO predicate acts that

13

did not implicate securities fraud).  And even if this were not the case, plaintiffs are incorrect to state that there was no purchase or sale of securities in 2003 or 2004.  During 2004, the five oil and gas entities other than Comet reorganized into CEA.  As part of this process, the investors in the other oil and gas entities gave their membership interests in those entities to CEA and received in return new membership interests in CEA itself.

Plaintiffs contend that a mere reorganization is not a purchase or sale of securities.  *See In re Penn. Cent. Sec. Litig.*, 494 F.2d 528, 533–39 (3d Cir. 1974) (reorganization that resulted in all shareholders of railroad becoming shareholders of holding company that owned all of railroad's stock and nothing else was not a purchase or sale of stock); *FMC Corp. v. Boesky*, 727 F. Supp. 1182, 1195–96 (N.D. Ill. 1989) (recapitalization whose main effect was to change the amount of equity held by three classes of shareholders was not a purchase or sale of stock).  Both *Penn Central* and *FMC*, however, recognized that generally a merger is a purchase or sale of stock under the securities laws.

> In such a merger between two corporations, the original shareholders of each corporation end up with stock in a substantially different company with substantially different assets and prospects.  The decision to vote in favor of the merger is therefore little different from the decision to sell shares in the original corporation and, with the cash received for those shares, buy shares in the merged corporation.

*In re Penn Cent.*, 494 F.2d at 534; *accord FMC Corp.*, 727 F. Supp. at 1194.  The cases recognized only that some unusual reorganizations might leave shareholders with essentially the same economic interest.

The CEA reorganization, by contrast, resulted in the investors holding

14

substantially different investments. The equity holders in each of the five oil and gas entities ended up with membership interests in a very different company. An investor in one of the former oil and gas entities no longer had a claim only on the assets and profits of that entity, but rather had a proportionate claim on the assets of all of the oil and gas entities that had been combined into CEA. For example, before the creation of CEA, none of the plaintiffs had any ownership interest in Orion, but after the creation of CEA, they owned the assets of Orion along with those of the other four oil and gas entities. For these reasons, unlike the situations presented in *Penn Central* and *FMC*, the CEA merger involved a purchase and sale of securities.

The CEA securities purchase and sale coincided with the frauds alleged by plaintiffs. According to plaintiffs, when Shaw could not pay Husman on loans that Husman had made to fund Shaw's casino, Husman removed Shaw as manager of the oil and gas entities and took most of his property, including his interest in Comet and unrelated real estate ventures. Husman then failed to include some of those assets in CEA, even though plaintiffs claim that Shaw's collateral should have been used to pay back the oil and gas entities.

In particular, plaintiffs focus on Husman's retention of Comet as an act that defrauded them. They claim that Comet's pipeline was funded with money from the oil and gas investors and the pipeline was intertwined with the other oil and gas entities, and so should have been included in CEA. Instead, Husman kept Comet out of CEA and even charged CEA to use Comet's pipeline. This fraud clearly coincided with the consolidation of the other oil and gas entities into CEA; in fact, the details of the CEA consolidation are a major aspect of the fraud. *See Jacoboni v. KPMG LLP*, 314 F.

Supp. 2d 1172, 1179–80 (M.D. Fla. 2004) (PSLRA barred RICO claim when purchase of securities was necessary to the rest of fraudulent scheme and plaintiff alleged a single scheme).

Similarly, plaintiffs contend that Husman took proceeds from Shaw's investments in the Grand Plaza and Red Bluffs real estate developments. Shaw's interests in those two properties, however, were transferred to EMS as a collection agent for the oil and gas entities. Pl. Ex. 27 at 29756, 29770. EMS told the oil and gas investors that it intended to transfer all of its interests to CEA as part of the CEA merger. Def. Ex. 12-A at 29101. If EMS did not transfer the proceeds from some of Shaw's investments and those proceeds instead went to Husman, that fraud also coincided with the combination of the oil and gas entities into CEA, which the Court has concluded involved a sale and purchase of securities.

Plaintiffs cite several cases in which courts determined that a RICO claim that tangentially involved securities was not barred by the PSLRA bar in section 1964(c). *See Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 872 (9th Cir. 2010) (RICO claim based on fraudulent tax avoidance scheme not barred by the fact that plaintiff had to pledge some securities as part of scheme, because there was no misrepresentation of the value of the securities); *Ouwinga v. John Hancock Variable Life Ins.*, No. 1:09-cv-60, 2010 WL 4386931, at *4–6 (W.D. Mich. Oct. 29, 2010) (fraudulent tax avoidance scheme that involved purchase of life insurance security was not barred by section 1964(c) because purchase of securities was incidental to purpose of fraud, and there was nothing fraudulent about the securities); *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 458 n.9 (S.D.N.Y. 2009) (PSLRA bar did not apply to

16

tax fraud RICO claim which involved the purchase of non-fraudulent securities). In all of these cases, however, the primary thrust of the fraudulent scheme was unlawful tax avoidance. In this case, by contrast, the primary thrust of the alleged scheme was to enrich Husman at the expense of investors who had bought his companies' securities. *See Moorehead*, 2011 WL 4496221, at *11–12 (securities were purchased as part of tax fraud, but RICO claims were barred because plaintiffs hoped to profit from securities beyond potential tax consequences) The securities in this case were more closely connected to the fraud than those in the cases cited by plaintiffs. In fact, as discussed above, the combination of the oil and gas entities into CEA was a central and essential part of the frauds upon which plaintiffs base their RICO claim.

In sum, the purchase and sale of securities related to the CEA merger coincided with the fraud that plaintiffs allege, and thus their RICO claim is barred under section 1964(c). In addition, the frauds that plaintiffs allege related to the Plaza Square and Treasures investments cannot be disaggregated from those related to the Shaw investments and the CEA merger, because plaintiffs allege that Husman used Equibase as part of a single fourteen-year scheme to defraud investors. *See Gilmore*, 2011 WL 3874880, at *6; *Jacoboni*, 314 F. Supp. 2d at 1179; *Scott v. Steingold*, No. 97 C 7871, 1998 WL 704287, at *4 (N.D. Ill. Sept. 30, 1998). Plaintiffs do not contend that there is any way to separate the frauds connected to Plaza Square and Treasures from that connected to the Shaw investments.

For these reasons, the Court grants summary judgment for Husman on plaintiffs' RICO claim.

**B.     Breach of fiduciary duty - Shaw investments**

Plaintiffs contend that Husman acted as their agent and fiduciary with respect to investments that they made in the oil and gas entities and breached his fiduciary duties by diverting assets to himself.  Husman contends that the plaintiffs lack standing to make this claim and that the breach of fiduciary duty claim is barred by the statute of limitations.

**1.     Standing**

Husman contends that any fiduciary duties he owed were owed directly to the oil and gas entities and not to the plaintiffs, who were merely investors in those entities. He argues that any suit on behalf of the oil and gas entities must be brought as a derivative action, which the plaintiffs do not seek to do.  He contends that the plaintiffs lack standing because they are attempting to assert the rights of the oil and gas entities. *See Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008) (prudential standing doctrine prevents plaintiffs from suing to enforce the rights of third parties).

The Court concludes, however, that a reasonable jury could find that Husman acted as a trustee or agent for the plaintiffs and thus owed duties directly to them.  *See Rawoof*, 521 F.3d at 757 (noting that shareholder can sue even when corporation could also bring a suit "if a special contractual duty exists between the wrongdoer and the shareholder").  Under either Nevada law, the state where the oil and gas entities were established, or Delaware law, where CEA was established, an investor in an entity may sue personally for redress if an injury is caused to him directly.  *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 887 (Del. Ch. 2009) (LLC member may make direct claims when he has suffered damage independent of any suffered by LLC); *Cohen v.*

*Mirage Resorts, Inc.*, 62 P.3d 720, 732 (Nev. 2003) (shareholder can sue when he loses an interest personal to him); *see CDX Liquidating Trust v. Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011) (federal district court uses choice of law rules of state in which it sits, and Illinois choice of law applies law of state of organization to entity).

Plaintiffs have presented evidence from which a reasonable jury could find that Husman acted as a trustee or agent for investors, and not merely with regard to the formally organized oil and gas entities. In 1997, several investors, including Ohadi, gave money to Husman, which he loaned to Shaw. The loan paperwork describes Husman as an "agent," and Husman admits that he acted as a trustee on the loan. Pl. Ex. 3 at 4744. Husman stated that the loan later became an equity interest in Pegasus, but even in the Pegasus operating agreement, the members of Pegasus were called only "The Husman Members" and Husman's business address was the only address listed for all of them. Def. Ex. 4-A at 1682. Similarly, the loan that Husman gave to Shaw to finance Comet listed Husman as an agent. Pl. Ex. 8 at 4298. Although the loan documents do not describe for whom Husman is an agent, and Husman denies acting as an agent for any of the plaintiffs on that loan, a reasonable jury could conclude that Husman acted as an agent or trustee for the plaintiffs even after Pegasus was established.

After Shaw gave many of his assets to EMS and Husman in 2003, Husman took actions consistent with acting as a trustee for the oil and gas investors. In September 2003, Husman sent a letter on Equibase letterhead stating that Shaw's interest in a development called Westpark had been assigned "to the members of 'Orion Associates' and 'Pegasus Associates.'" Pl. Ex. 34. He directed that any proceeds from Westpark

"are to be remitted to me as trustee." *Id.* Although other documents show that Shaw had pledged Westpark to Equibase as collection agent for the oil and gas entities, Husman's letter could allow a reasonable jury to find that he was acting personally as a trustee and for the members of Orion and Pegasus, not just for the entities themselves. Furthermore, in 2005 Husman distributed money from Shaw's interest in Westpark to the members of Pegasus and Orion. Pl. Ex. 49. He did not distribute the money to CEA, which had received all of the membership interests of Orion and Pegasus in 2004, but directly to a number of the oil and gas investors.

Similarly, James Mann testified that Husman told him in 2004 that he had received Shaw's collateral and was holding it for the benefit of Pegasus investors. Pl. Ex. 33 at 254–55. Mann also stated that he asked Husman "pointed questions about the assets seized from Mr. Shaw" and Husman stated that he was holding the assets on investors' behalf. Pl. Ex. 51 ¶ 7. Husman also wrote a letter to Ohadi in 2005 stating that he was holding an interest of Shaw's for Ohadi as a trustee. Pl. Ex. 50.

Husman argues that the evidence is clearest that he owed a duty to investors in Pegasus and that neither MJK or Mann had any investment in Pegasus. Nonparty Clarence Mann, however, did have an investment in Pegasus that he sought to transfer to the Mann Trust in 2001. A transfer of interest required the written consent of all members in Pegasus. Def. Ex. 4-A at 1642. It is undisputed that Clarence never got the written consent of all the beneficial owners of Pegasus. James Mann, however, stated that in late 2000 Husman approved the transfer of Clarence's interest to the Mann Trust and never informed James that the transfer had not been effectuated. Pl. Ex. 51 ¶¶ 4–5. James testified that in 2005 he realized that the paperwork for the

20

transfer was arguably incomplete and submitted new documentation to CEA. Def. Ex. 8-A at 230–32. Husman admits that he signed the transfer. As Husman's was the only name and address listed in the Pegasus operating agreement for all the members, a reasonable jury could conclude that Husman could consent for all of the members and that Clarence's interest was transferred in 2000 or 2001 to the Mann Trust. If so, the Mann Trust would have thereby succeeded to Clarence's rights in Pegasus and would have been a member in 2003 when Husman directed that the proceeds of Shaw's interest in Westpark be given to him as trustee for the Pegasus members.

Husman also contends that the plaintiffs, like all investors in the oil and gas entities, contributed their interests in the oil and gas entities to CEA as part of the 2004 reorganization. He argues that as a result, any interests that could provide standing to the plaintiffs became interests of CEA in 2004. As discussed above, however, a reasonable jury could find that Husman was holding assets as a trustee for the plaintiffs outside of the formal oil and gas organizations and that duties owed to the plaintiffs related to those assets were not part of the oil and gas entity membership interests they contributed to CEA.

In sum, a reasonable jury could find that Husman acted as a trustee or agent for the plaintiffs outside of the oil and gas entities. Husman does not contest that if he was a trustee or agent, he owed fiduciary duties to the beneficiaries of the trust or to his principals. *See Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 615, 863 N.E.2d 743, 754 (2007); *Letsos v. Century 21-New West Realty*, 285 Ill. App. 3d 1056, 1064, 675 N.E.2d 217, 224 (1996). The Court therefore rejects Husman's contention that plaintiffs lack standing as a matter of law.

21

## 2.    Statute of limitations

Husman also contends that any breach of fiduciary duty claim related to the Shaw investments is time-barred.  Although Husman initially suggested that Illinois, Nevada, or Delaware law might apply to the breach of fiduciary duty claim, he did not respond to plaintiffs' argument that Illinois law applies and thus effectively conceded the issue.  The Court therefore applies Illinois law.

Under Illinois law, a five-year limitations period applies to breach of fiduciary duty claims.  735 ILCS 5/13-205; *Armstrong v. Guigler*, 174 Ill. 2d 281, 294, 673 N.E.2d 290, 296 (1996).  Plaintiffs filed this suit on January 7, 2010.  Accordingly, plaintiffs' breach of fiduciary duty claim must have accrued on or after January 7, 2005 to be timely.  Illinois courts use a discovery rule to determine when claims accrue.  A limitations period does not begin to run "until the injured plaintiff knows or reasonably should have known that he has been injured and that his injury was wrongfully caused." *Mitsias v. I-Flow Corp.*, 959 N.E.2d 94, 100 (Ill. App. Ct. 2011).

Husman contends, however, that in September 2003 he sent a letter to Ohadi and James Mann informing them that Shaw had misused oil and gas entity funds and that EMS had replaced Shaw as the manager of the oil and gas entities.  Husman also notes that when plaintiffs transferred their interests in the oil and gas entities to CEA in May 2004, they signed documents stating that had received all documents and information from CEA, were not seeking additional information, and were not relying on any representations from CEA or anyone affiliated with it.  Husman states that the limitations period for the breach of fiduciary duty claim must have begun to run in September 2003 or May 2004, because plaintiffs reasonably should have known they

22

had been wrongfully injured, making the current claim untimely.

Under Illinois law, however, the limitations period for a claim against a defendant does not begin to run because the plaintiff knows that he has been injured by another individual. *Mitsias*, 959 N.E.2d at 103 (plaintiff knew that he was injured by surgery but could not have learned that faulty medical device was installed until 2007; limitations period against medical device manufacturer did not begin to run until 2007). Nor are the injuries caused to plaintiffs by Shaw and Husman entirely the same. Husman's 2003 letter stated only that Shaw had improperly used oil and gas entity funds personally and had commingled the funds of the various oil and gas entities. Def. Ex. 4-B. The letter did not contain any information about the property that Husman allegedly diverted away from investors by taking Shaw's interest in Comet for himself or keeping the proceeds of Shaw's interests in Grand Plaza and Red Bluffs. In fact, Husman's alleged retention of proceeds in Grand Plaza and Red Bluffs did not occur until 2004 and 2007 respectively. It was also not until 2004 that Husman kept Comet from being included in CEA along with the other oil and gas entities. Husman's 2003 letter could not have alerted the plaintiffs to claims related to any of these actions that had not yet occurred. The information that plaintiffs received about CEA also did not reference the fact that Husman had received Shaw's interest in Comet or the source of Comet's funding.

Plaintiffs have presented evidence from which a reasonable jury could conclude that they could not have discovered that they were injured and that the injury was wrongfully caused by Husman until after 2005 because Husman was concealing information from them. In the 2003 letter about Shaw's misconduct, Husman did not indicate that he had been loaning money to Shaw for his casino business and that he

was one of the creditors whom Shaw was attempting to repay when he took money from the oil and gas entities. Further, Husman stated that EMS had hired outside legal counsel and forensic accountants to investigate and thereby suggested that EMS would act diligently to recover assets from Shaw. Def. Ex. 4-B. Husman's son Michael testified at his deposition, however, that the investigators hired by EMS did not finish their work and produced no report about Shaw's misconduct and that no one was hired to replace them. Pl. Ex. 31 at 110–11.

In the memorandum related to the CEA reorganization, Husman stated that EMS had worked to obtain Shaw's oil and gas assets for the benefit of the oil and gas entities, and he did not disclose that he had taken Shaw's interest in Comet personally. Def. Ex. 12-A at 29106. EMS also stated that it would turn over all of the assets that it had received from Shaw to CEA, although plaintiffs have alleged that Husman in fact kept some of those assets for himself. *Id.* at 29110.

Husman also suggested to plaintiffs that he was protecting their interests in relation to Shaw's misconduct. As discussed above, Mann testified that Husman told him in 2004 that he had received Shaw's collateral and was holding it for the benefit of Pegasus investors. Pl. Ex. 33 at 254–55. Husman also wrote a letter to Ohadi in 2005 stating that he was holding an interest of Shaw's for Ohadi. Pl. Ex. 50.

Plaintiffs have stated that they did not learn of Husman's role in their injuries, or that many of the things he told them in the 2003 letter and the CEA memo were untrue, until after 2005. Ohadi stated that he heard from Shaw in 2006 or 2007 that Husman was involved and then began asking Husman for more documentation. Pl. Ex. 35 ¶¶ 4–5. Mann stated that it was not until 2009 that he received documents from Shaw that

24

allowed him to see what Husman had done, and that before this, Husman had reassured him that only Shaw was to blame and that he (Husman) was holding assets for the investors.  Pl. Ex. 51 ¶¶ 6–7.

For these reasons, Husman is not entitled to summary judgment on this claim based on the statute of limitations.

## C.     Breach of fiduciary duty - Plaza Square investment

Husman contends, among other arguments, that Ohadi's breach of fiduciary duty claim is time barred.  He contends that the only basis for Ohadi to claim a fiduciary duty is the fact that Husman acted as Ohadi's lawyer.  Husman argues that as a result, the claims are subject to the two-year statute of limitations and six-year statute of repose that govern actions arising from a lawyer's professional services.  735 ILCS 5/13-214.3(b) & (c).  Husman contends that the actions for which Ohadi is attempting to sue occurred on August 30, 2002, the date on which his loan first came due and Husman allegedly failed to take any actions to protect or enforce Ohadi's rights.  Husman therefore concludes that the limitations period ended on August 30, 2002 and the repose period on August 30, 2008.

Ohadi contends that Husman was providing legal advice to him and violating his fiduciary duties through September 2007, when Husman told Ohadi that another lawyer who had opined that the Plaza Square investors' assets were being dissipated did not have the facts and that Carlson's personal guarantee was worthless.  Pl. Ex. 54.  Even a breach of fiduciary duty claim based on these statements, however, would be time-barred, because Ohadi did not sue until January 7, 2010.  Ohadi does not suggest that he could not reasonably have discovered that Husman was violating his fiduciary duty at

the time.  No reasonable jury could conclude that Ohadi could not have discovered the facts of Husman's breach by then.  At that point, Ohadi's loan was years overdue, and he was already suspicious of Husman and had heard another lawyer's opinion that Husman was committing a fraud on the Plaza Square investors.  *Id.*  The Court concludes that Ohadi's breach of fiduciary duty claim is barred by the statute of limitations applicable to claims against attorneys.

Ohadi suggests that Husman's actions also amount to fraudulent concealment, arguing that the claim is therefore subject to a five-year statute of limitations starting on the date that Ohadi discovered that he had a cause of action.  735 ILCS 5/13-215.  The Illinois Supreme Court has held, however, that the fraudulent concealment statute does not affect the statute of limitations if, when a plaintiff discovers a cause of action, there is still a reasonable time to bring a claim within the applicable limitations period.  *Morris v. Margulis*, 197 Ill. 2d 28, 38, 754 N.E.2d 314, 319–20 (2001).  *Morris* involved a situation very similar to this one.  A plaintiff learned of an attorney's breach of fiduciary duty, that had earlier been fraudulently concealed but did not bring suit within two years. *Id.*  The court held that because the standard two-year statute of limitations for claims against attorneys gave ample time to the plaintiff, the fraudulent concealment statute of limitations did not apply.  *Id.*  Similarly, Ohadi had two years to file a claim based on Husman's September 2007 statements or any other breach of fiduciary duty Ohadi had not discovered until that time.  The longer limitations period applicable to fraudulent concealment does not apply.

Ohadi also argues that Husman agreed to be his agent to collect the Plaza Square debt from Carlson and owes him a fiduciary duty as an agent as well.  A claim

26

for breach of that duty would be subject to a longer five-year statute of limitations.  735 ILCS 5/13-205.  The only evidence Ohadi provides to support this contention is his own deposition testimony that "Mr. Husman told me all the time that he's going to get my money back" and that Husman said he could not pay Ohadi back until Carlson repaid him (Husman).  Pl. Ex. 18 at 289, 321.  Ohadi also testified, however, that he told Husman to sue to get the money back.  This indicates that any actions Husman promised to take to recover the debt were actions as a lawyer.  A breach of those promises would be subject to the shorter two-year statute of limitations.  No reasonable jury could conclude from this evidence that Husman agreed to be Ohadi's agent in collecting the debt from Carlson.

The Court grants summary judgment in Husman's favor on Ohadi's breach of fiduciary duty claim.

## D.    Breach of contract and unjust enrichment - Plaza Square investment

Husman contends that Ohadi lacks standing to bring his claims based on the Plaza Square investment; the claims are time barred; and the unjust enrichment claim concerning this investment is barred because there was a contract between Ohadi and Husman.

### 1.    Standing

Husman contends that Ohadi lacks standing because his interests in Plaza Square are held by the Ohadi Trust and "Paul Ohadi, Trustee," and not by Ohadi personally.  The complaint alleges that the breach of contract and unjust enrichment claims are brought by "Ohadi."  There is no mention of any trust in the paragraphs of the complaint addressing each claim, though the claims incorporate paragraphs of the

27

complaint discussing the trust.

Husman argues that these claims run afoul of the requirement that the real party in interest bring the suit. Fed. R. Civ. P. 17(a)(1); *Rawoof*, 521 F.3d at 756 (party who brings suit must be entitled to enforce the right). Rule 17, however, specifically provides that a trustee may sue in his own name even if the trust is not joined in the action. Fed. R. Civ. P. 17(a)(1)(E). Ohadi has sued both in his own name and as trustee for the Ohadi Trust.

Ohadi has testified that he has no other trusts. Pl. Ex. 18 at 324–25. Husman contends that because part of the Plaza Square investment is held by the Ohadi Trust and part by "Paul Ohadi, Trustee," Ohadi must have more than one trust. There is no evidence, however, that a second trust existed or that part of the Plaza Square investment was held by the second trust. And even if there were a second trust, Ohadi could also sue in his own name on behalf of the second trust without joining it in this suit. Fed. R. Civ. P. 17(a)(1)(E).

The complaint could be read as stating that Ohadi is asserting the breach of contract and unjust enrichment claims individually, so amendment of the complaint to make clear that the right of recovery is that of the trust may clarify the issue. Husman has not, however, suggested that he suffered any prejudice from the complaint as written. Furthermore, the proper remedy for a violation of Rule 17 is to allow time for the real party in interest to be joined. Fed. R. Civ. P. 17(a)(3). The Court concludes that it may not grant summary judgment without allowing the plaintiffs to amend the complaint to make clear capacity in which Ohadi is suing.

In addition, Ohadi contends that Husman has forfeited any argument that the real

28

party in interest is not present by not raising the issue as an affirmative defense and waiting until summary judgment. *See Trenwick Am. Rein. Corp. v. IRC, Inc.*, 764 F. Supp. 2d 274, 293 (D. Mass. 2011) ("courts . . . have overwhelmingly held that a Rule 17 objection is waived if not raised with reasonable promptness"). In response, Husman does not dispute that he failed to raise the issue earlier. He claims, however, that the issue of standing is jurisdictional and the Court must address it. The doctrine of third-party standing, however, is prudential and not constitutional. *Rawoof*, 521 F.3d at 756–57. A district court may dismiss a suit for lack of prudential standing even if the parties fail to raise the issue, but it need not do so. *Id.* at 757. The Court declines to overlook Husman's waiver, because any incorrect assertion of the claims in Ohadi's name has not prejudiced Husman, and Ohadi has sued both in his own name and on behalf of the Ohadi Trust.

Husman also contends that Ohadi has no standing to complain that Husman seized the collateral Carlson had pledged to secure the Plaza Square loan, because Ohadi never actually acquired any membership interest in Plaza Square and thus acquired no interest in the collateral. Husman's argument appears to be primarily directed at Ohadi's breach of fiduciary duty claim, on which the Court has already granted summary judgment. In addition, the Court notes that Ohadi's breach of contract and unjust enrichment claims are not based on any rights to the Carlson collateral, but only the assertion that Ohadi gave $3 million to Husman and has not been repaid. The fact that Husman managed to repay himself by seizing the collateral may be evidence that Husman's enrichment is unjust, but Ohadi's claims do no require that he have a right to the Carlson collateral.

## 2.    Statute of limitations

Husman also contends that Ohadi's breach of contract and unjust enrichment claims are time-barred.

Husman argues that the breach of contract claim, which is subject to a five-year limitations period as an oral contract, accrued when payment was due under the contract.  735 ILCS 5/13-205; *Kozasa v. Guardian Elec. Mfg. Co.*, 99 Ill. App. 3d 669, 673, 425 N.E.2d 1137, 1142 (1981).  Husman states that this occurred on August 30, 2002, when repayment of the principal of the loan was due.  Under Illinois law, however, "[i]t is clear that part payment of a debt tolls the statute of limitations such that it commences to run from the date of last payment."  *St. Francis Med. Ctr. v. Vernon*, 217 Ill. App. 3d 287, 289, 576 N.E.2d 1230, 1231 (1991); *see Davis v. World Credit Fund I, LLC*, 543 F. Supp. 2d 953, 957 (N.D. Ill. 2008).  It is undisputed that Ohadi received a payment from Husman on the Plaza Square debt on June 6, 2005.  Ohadi filed suit less than five years later, on January 7, 2010.  The breach of contract claim is timely.

Husman also contends that Ohadi's unjust enrichment claim is untimely.  Unjust enrichment claims are subject to a five-year limitations period.  735 ILCS 5/13-205; *Lewandowski v. Jelenski*, 401 Ill. App. 3d 893, 897, 929 N.E.2d 114, 119 (2010). Husman argues that Ohadi's claim accrued on August 30, 1999, when he paid the money at issue to Husman, and that the limitations period thus expired on August 30, 2004.

Husman bases his argument on the decision in *Lewandowski*.  There, the plaintiff made a series of payments to the defendant to fund a real estate development, but none of the money was ever used for the purpose.  *Id.* at 895, 929 N.E.2d at 117.  The

30

court assumed that the claim accrued on the date of the final payment, because the plaintiff's complaint did not "allege that there was a delay in the discovery of the facts leading to the filing of this lawsuit, but only that plaintiff's monies were not used to acquire or develop the Property and that her monies were never returned to her." *Id.* at 897, 929 N.E.2d at 119.

Unlike the plaintiff in *Lewandowski*, and contrary to Husman's assertion, Ohadi has offered evidence with which a reasonable jury could conclude that Ohadi could not reasonably have discovered the facts underlying his unjust enrichment claim before January 2005, making the claim timely. Husman wrote a letter to Ohadi in June 2005 stating that Carlson had promised he would pay all the interest due on Ohadi's loan by August 1, 2005 and would pay off the principal by the end of the year. Pl. Ex. 55. At the same time, Husman was concealing the fact that he had received Carlson's interest in the Grand Apartments and was using the majority of the proceeds from the apartments' sale to pay off loans to his children and his foundation. Pl. Ex. 41. In May 2007, Husman told Ohadi that his investment was not a loan but rather was a purchase of equity in Plaza Square, but he failed to inform Ohadi that he had never actually acquired any equity. Pl. Ex. 53. Finally, as discussed above, in September 2007 Husman wrote to Ohadi that Carlson's personal guarantee was worthless and told Ohadi that another lawyer, who had opined that Husman or Carlson was committing fraud, did not have the facts. Pl. Ex. 54.

A reasonable jury could conclude that Husman's misstatements and obfuscation prevented Ohadi from discovering the basis of his unjust enrichment claim before 2005 and that the claim is therefore timely.

### 3. Validity of unjust enrichment claim

Husman finally contends that Ohadi's unjust enrichment claim is barred because Husman has admitted the existence of an oral contract. Under Illinois law, unjust enrichment and other quasi-contractual relief are available only when there is not an enforceable contract between the parties. *Cromeens, Holloman, Siber, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003).

Husman has admitted that he orally agreed to a $3 million loan from Ohadi, payable over three years with twelve percent interest. Def. Stat. of Undisputed Facts ¶ 87. He has expressly done so, however, only for the purpose of resolving his motion for summary judgment. Def. Br. at 1 n.2. At other times, Husman has denied the existence of a contract or even a loan from Ohadi to him. Def. Ans. ¶ 115; Pl. Ex. 1 at 304–06; Pl. Ex. 53.

Husman cannot admit that there was a contract and win summary judgment on Ohadi's unjust enrichment claim, then at trial deny the existence of a contract and seek to prevail on that theory. Because Husman has not admitted the existence of a contract for the loan for all purposes, there are disputed issues of fact surrounding the existence of the contract. The Court therefore declines to grant summary judgment on this basis. *See BI3, Inc. v. Hamor*, No. 08 C 2384, 2011 WL 1231156, at *9 (N.D. Ill. Mar. 30, 2011) (refusing to grant summary judgment on unjust enrichment and quantum meruit claims when there were disputed issues of fact surrounding existence and enforceability of contract).

### E. Breach of contract - Treasures investment

Husman argues that summary judgment is appropriate on Ohadi's breach of

contract claim related to the Treasures investment because Ohadi lacks standing for the same reasons he argued in relation to the Plaza Square claims. The interest in Treasures is 100% owned by the Ohadi Trust. Def. Ex. 26. The Court declines to grant summary judgment on this claim for the reasons discussed above: Ohadi can sue in his own name as trustee of the Ohadi Trust; the complaint expressly states that Ohadi is suing for himself and on behalf of the Ohadi Trust; Husman has not claimed any prejudice from the ambiguity in the complaint; and Husman has forfeited this issue by not raising it earlier.

## Conclusion

For the reasons stated above, the Court grants Husman's motion for summary judgment in part and denies it in part [docket no. 126]. Specifically, the Court grants summary judgment for Husman on plaintiffs' RICO claim (Count 1) and Ohadi's breach of fiduciary duty claim (Count 3). The Court denies the remainder of the motion.

MATTHEW F. KENNELLY
United States District Judge

Date: July 1, 2012